UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------x
:
MICROBOARD PROCESSING, INC. : 3:09 CV 708 (JBA)
:
V. :
:
CRESTRON ELECTRONICS, : JANUARY 11, 2011
INC. :
:
------------------------------------------------x

RECOMMENDED RULING ON PLAINTIFF'S MOTION TO REOPEN CASE AND/OR
ENFORCEMENT SETTLEMENT AGREEMENT (Dkt. #53), ON PLAINTIFF'S SUPPLEMENTAL
MOTION TO ENFORCE SETTLEMENT AND RELEASE AGREEMENT (Dkt. #63 ), AND ON
DEFENDANT'S MOTION TO ENFORCE SETTLEMENT AGREEMENT (Dkt. #73)

On or about March 31, 2009, plaintiff Microboard Processing, Inc. commenced this lawsuit against defendant Crestron Electronics, Inc. in the Connecticut Superior Court in Milford; defendant removed the action to federal court on April 30, 2009. (Dkt. #1). Plaintiff filed its Amended Complaint on December 4, 2009 (Dkt. #27); thirteen days later, defendant filed a Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim. (Dkts. ##30-32).

On February 2, 2010, U.S. District Judge Janet Bond Arterton referred the file to this Magistrate Judge for settlement (Dkt. #38), and on March 10, 2010, this Magistrate Judge conducted a four and one-half hour settlement conference, followed by literally dozens of telephone calls not reflected on the electronic docket sheet, and followed by a fifteen minute telephone conference on June 30, 2010. (Dkts. ##37, 43, 50; see also Dkts. ##45-46). On June 8, 2010, counsel reported the case as settled and defendant's Motion to Dismiss was denied without prejudice as moot (Dkt. #51); the next day, an Order was filed closing the court file. (Dkt. #52).

Unfortunately, as the electronic docket sheet indicates, this file did not remain

inactive for long. One month later, on July 8, 2010, plaintiff filed its Motion to Reopen Case and/or Enforce Settlement Agreement. (Dkt. #53).[1] Thereafter, over the next month, this Magistrate Judge held an additional six telephonic settlement conferences, some as short as two minutes and others as long as fifteen minutes, between July 13, 2010 and August 16, 2010. (Dkts. ##54-55, 57, 59-61; see also Dkts. ##56, 58, 62).

Approximately one month later, on September 14, 2010, plaintiff filed its Supplemental Motion to Enforce Settlement and Release Agreement. (Dkt. #63).[2] Over the next six weeks, on September 20, 2010, this Magistrate Judge held another telephonic settlement conference, lasting twenty-five minutes, and still another on October 18, 2010, lasting fifteen minutes. (Dkts. ##64, 72; see also Dkts. ##68-71). Five days after the last conference, on October 23, 2010, defendant filed its Cross-Motion to Compel Enforcement of Settlement Agreement, brief, affidavits, and exhibits in support. (Dkts. ##73-78).[3] Yet

---

[1] The following four exhibits were attached: copy of e-mail correspondence between counsel, dated June 22 and July 8, 2010 (App. A); copy of e-mail correspondence between counsel, dated June 7 and 11, and July 8, 2010 (App. B); copy of e-mail correspondence between counsel, dated June 7 and July 8, 2010 (App. C); and copy of plaintiff's Motion to Restore Case to Active Docket, with multiple exhibits, filed on October 23, 2009 (App. D; see also Dkt. #17).

[2] The following four exhibits were attached: copy of Settlement and Release Agreement, dated August 20, 2010, with a twenty-four page attachment (Exh. A); copy of e-mail correspondence between counsel, dated September 10, 2010, with copy of Joint Motion for Entry of Order Approving Settlement and Release Agreement, dated September 10, 2010 and another copy of Settlement and Release Agreement, dated August 20, 2010, and twenty-four page exhibit (Exh. B); copy of Affidavit of Michael Dunn, sworn to September 14, 2010 ["Dunn Aff't"](Exh. C); and copy of letter between counsel, dated September 13, 2010 (Exh. D).

[3] The affidavits are from David Hakula, dated October 12, 2010 (Dkt. #75)["Hakula Aff't"], from defense counsel, dated October 22, 2010 (Dkt. #76)["Allentuch Aff't"], with three exhibits -- another copy of the Settlement and Release Agreement, dated August 20, 2010, with twenty-four page attachment (Exh. 1), copies of letters between counsel, dated September 28 and October 18, 2010 (Exh. 2), and copy of e-mail correspondence between counsel, dated October 21, 2010 (Exh. 3 #); and from Jorge Urtega, dated October 12, 2010 (Dkt.#77)["Urtega Aff't"], with four exhibits – copy of IPC Certification List for 2009 (Exh. 1), copy of Defective Inventory Spreadsheet (Exh. 2), copy of Joint Industry Standard, dated January 2007 (Exh. 3), and copies of photographs (Exh. 4).

Attached as Dkt. #78 is a copy of case law.

another telephonic settlement conference was held before this Magistrate Judge on December 2, 2010 (Dkts. ##84-85, 87) and eight days later, on December 10, 2010, plaintiff filed its brief in opposition to defendant's cross-motion. (Dkt. #86; see also Dkts. ##80-84).[4] On December 31, 2010, defendant filed its reply brief. (Dkt. #90; see also Dkts. ##88-89).[5]

On September 21, 2010, and again on November 4, 2010, Judge Arterton referred the pending motions to this Magistrate Judge. (Dkts. ##65, 79).[6]

For the reasons stated below, plaintiff's Motion to Reopen Case and/or Enforce Settlement Agreement (Dkt. #53) is <u>granted in part to the extent plaintiff seeks to reopen the case to consider these motions</u>, and the two remaining motions – plaintiff's Supplemental Motion to Enforce Settlement and Release Agreement (Dkt. #63), and defendant's Motion

---

[4]Two exhibits were attached: copy of affidavit of defense counsel, sworn to December 10, 2010 (Exh. A); and affidavit of Donald J. Preziosi, sworn to December 10, 2010 ["Preziosi Aff't"] (Exh. B), to which is attached a copy of an e-mail between the parties, dated September 24, 2007 (Subexh. A).

[5]Attached was the affidavit of Bill Delaney, sworn to on December 30, 2010 ["Delaney Aff't"].

[6]Paragraph 8(g) provides in part: "In the event of a dispute concerning this [Settlement] Agreement, the disputing party or parties are required to mediate such dispute before the Magistrate Judge . . . before commencing or recommencing any litigation."

Defendant initially objected to this Magistrate Judge considering these pending motions (Dkt. #67), but the law is well-established in the Second Circuit and in this District that a judicial officer is not recused from deciding a motion to enforce a settlement because of his or her involvement in the underlying settlement negotiations. Copp v. State of Connecticut, 310 Fed. Appx. 436, 438 (2d Cir. 2009); Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 448 (2d Cir. 2005); Hunte v. Anders, No. 3:05 CV 1017 (JBA), 2008 WL 6930191, at *1, n.1 (D. Conn. June 13, 2008); Scarola Reavis & Parent LLP v. Diggs, No. 04 CV 1370 (RJD)(SMG), 2006 WL 3694583, at *2 (E.D.N.Y. Dec. 14, 2006)("Having presided over the conference at which the settlement agreement was reached, [the Magistrate Judge is] particularly mindful . . . that a district court has not only the power but the duty to enforce a settlement agreement which it has approved.")(internal quotations & citations omitted); Walker v. City of New York, No.05 CV 0004 (JBW)(JMA), 2006 WL 1662702, at *6 (E.D.N.Y. June 15, 2006). See also Brandt v. MIT Dev. Corp., 552 F. Supp. 2d 304,317-18 (D. Conn. 2008).

to Enforce Settlement Agreement (Dkt. #73) – are held in abeyance, pending an evidentiary hearing.

## I. DISCUSSION

"It is within the inherent powers of a trial court to enforce summarily a settlement agreement when the terms of the agreement are clear and unambiguous[,]" in that "[s]ummary enforcement is not only essential to the efficient use of judicial resources but also preserves the integrity of settlement in a meaningful way to resolve legal disputes." Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 444 (2d Cir. 2005)(internal quotations & citations omitted); Hunte v. Anders, No. 3:05 CV 1017 (JBA), 2008 WL 6930191, at 2 (D. Conn. June 13,2008(same); New Horizon Fin. Servs., Inc. v. First Fin'l Equities, Inc., No. 3:00 CV 1461 (JBA), 2003 WL 22004255, at *4 (D. Conn. Mar. 26, 2003)(same); Audobon Parking Assocs. Ltd. P'ship v. Barclay & Stubbs, Inc., 225 Conn. 804, 811 (1993)(same); Massey v. Town of Branford, 118 Conn. App. 491, 492, 496 (Ct. App. Ct. 2009)(same), certif. denied, 295 Conn. 913 (2010). See also Bourguignon v. Lantz, No. 3:05 CV 245 (WIG), 2009 WL 179793, at *1 (D. Conn. Jan. 21, 2009)(citation omitted).

There is no dispute that after much discussion, the parties negotiated a five-page Settlement and Release Agreement ["Settlement Agreement"], dated August 20, 2010, with a twenty-four page attachment. (Dkt. #63, at 2 & Exhs. A-B; Dkt. #74, at 1, 6; Allentuch Aff't, ¶ 2 & Exh. 1). Paragraph 2 provided that within twenty days of full execution of the agreement, defendant would pay plaintiff $117,500.

At issue in the pending motions is paragraph 1, which provided in full:

> 1. Return of Excess Materials. [Plaintiff] shall return to [Defendant] the Excess Materials in "as-is/where-is" condition to [Defendant], without any warranty being extended. Notwithstanding the foregoing, [Plaintiff] represents that the Excess Materials have been maintained: (1) in the ordinary course of business; and (2) in a commercially reasonable manner for

4

> Excess Materials. [Plaintiff] further represents that Exhibit A is true and accurate. [Plaintiff] shall make the Excess Materials available for inspection during business hours and such inspection shall take place within ten (10) days from the full execution of this Agreement. Defendant may reasonably inspect the Excess Materials to determine whether [Plaintiff's] representations are materially accurate. The inspection shall take place on a single calendar day. In an effort to clarify the condition of the Excess Materials, if [Plaintiff's] representations are not materially accurate, or the Excess Materials are not organized in such a fashion (i.e reasonably accessible and predominately in one location) that it is reasonably possible to complete the inspection in one calendar day, the inspection may take longer than one day.
>
> Once [Defendant] determines that those representations are materially accurate, [Defendant] shall pay the settlement funds specified in paragraph two below. After the settlement funds referenced in paragraph two below have been cleared, [Defendant] shall pay for and be responsible for transporting the Excess Materials from [Plaintiff's] facility. [Defendant] shall provide reasonable cooperation to facilitate the transport of the Excess Materials to [Defendant], including, but not limited to, the packaging and loading of the goods on to trucks for the purpose of shipment to [Defendant]. Carrier selection and freight expense [shall] be[] the responsibility of [Defendant]. This shall occur within twenty (20) days after the full execution of this Agreement.

The "Excess Materials" are defined as the items listed in the twenty-four page attachment. (Settlement Agreement at 1 & Exhibit A). However, paragraph 1 fails to address the consequences of the situation that has arisen here – defendant's allegation that the Excess Materials were not maintained in the ordinary course of business and in a commercially reasonable manner for Excess Materials.

Both parties agree that the Settlement Agreement is the binding document here. (Dkt. #63, at 2; Dkt, #74, at 1, 2). Both parties further agree that Paragraph 1 "was extremely hard fought and the subject of many revisions and discussions with the Magistrate Judge." (Dkt. #74, at 9; Dkt. #86, at 3-4). The parties additionally agree that on September 9, 2010, an inspection of the Excess Materials was performed by Jorge Urtega, a Senior Quality Manager for defendant, in the presence of Michael Dunn, plaintiff's former President, during which Urtega did not raise any concerns that such materials had been

improperly stored or maintained; four days later, however, defense counsel sent a letter to plaintiff's counsel that "[a]fter a thorough inspection of the inventory it was evident that the materials were not maintained in a commercially reasonable manner of excess materials[,]" that the inspection was performed by an "employee with expertise in this area[,]" that "[m]any of the parts were damaged by moisture because they were not properly stored[]" in that they were not "hermetically vacuum sealed in ESD bags along with desiccant[,]" that defendant "has performed a detailed analysis of the items on the Inventory list[,]" and that "[d]ue to the clear violations of the representations contained in Section 1 of the Settlement and Release Agreement, [Defendant] cannot pay [Plaintiff] for useless and damaged Inventory." (Dkt. #63, at 2-3 & Exh. D; Dunn Aff't, ¶¶ 4-6, 9, 12; Dkt. #74, at 3-5; Urtega Aff't, ¶¶ 4-5).

According to plaintiff, the Excess Materials always have been stored and maintained "in the ordinary course of business and in a commercially reasonable manner at all times," previously have been inspected by defendant at plaintiff's facility "on multiple, prior occasions[,]" and "have not been disrupted or altered since those earlier inspections." (Dkt. #63, at 3; Dunn Aff't ¶ 8). Plaintiff continues that at no time prior to September 13, 2010 did defendant claim that the Excess Materials were not properly stored or maintained, or did it demand or request a different method of storage or maintenance. (Dkt. #63, at 3; Dunn Aff't ¶ 9). Plaintiff further contends that the Excess Materials "have been stored consistent with industry standard, in the manner that [Defendant] has known and acquiesced to since its prior inspections[,]" that it is "impossible" for defendant's representative to have determined during his inspection, "to which he brought no specialized testing [or] other such equipment, that certain of the Excess Materials were . . . 'useless and damaged[,]'" that it is impossible for defendant's representative "to have determined from a mere visual

inspection that the 'parts were damages by moisture[,]'" and that "none of these Excess Materials have been damaged by moisture at all . . . ." (Dkt. #63, at 3-4; Dunn Aff't ¶¶ 10-11).

In contrast, defendant argues that Urtega spent approximately eleven hours at plaintiff's facility on September 9, 2010, and based upon his "physical inspection" of the Excess Materials, he prepared a spreadsheet showing which of the "[m]any items" were not properly maintained, in accordance with the industry standards written and issued by the JEDEC Solid State Technology Association ["JEDEC"] and the IPC Association Connecticut Electronics Industries ["IPC"], with which he is familiar and which apply to defendant. (Dkt. #74, at 3-4; Urtega Aff't ¶¶ 1-5 & Exhs. 1-3). Urtega contends that plaintiff "failed to properly maintain the Defective Inventory because it failed to take the steps required in the industry that protect these items from moisture[,]" even though they "were in a temperature controlled environment with some moisture controls[,]" and as a result, the moisture "render[ed] them inoperative or unreliable[]" as a component in circuit boards. (Dkt. #74, at 4-5; Urtega Aff't ¶¶ 6-10 & Exhs. 1-3). According to Urtega, the electronic components should have been dried, then "repacked" in a moisture barrier bag with active desiccant, and the bag thereafter "should [have been] heat sealed" and "light air evacuation employed"; Urtega instead avers that these steps were not followed and the Defective Inventory was "stored in a somewhat haphazard manner." (Dkt. #74, at 5; Urtega Aff't, ¶¶ 11-12 & Exh. 4). Urtega further asserts that plaintiff's offer to "bake" these items "is not a viable solution[,]" that the products must be discarded "by a special disposal service[,]" and that it is not economically feasible to address each item individually. (Dkt. #74, at 5; Urtega Aff't, ¶¶ 13-15). Thus, Urtega concludes: "[T]he Defective Materials have not been maintained according to applicable standards. [Plaintiff's] lack of diligence in maintaining

these items was not commercially reasonable. The Defective Inventory has no use and has no value or has a negative value." (Dkt. #74, at 5; Urtega Aff't ¶ 16). Defendant acknowledges that defendant's file review reflects that "at some point during the past four or five years, . . . closer to the 2007 time frame[,]" one of defendant's employees, who was not a Quality Manager, visited plaintiff and made a visual inspection of the Excess Inventory, but defendant's files do not contain any notation about the way the Excess Inventory was stored. (Dkt. #74, at 9-10; Hakula Aff't, ¶¶ 2-3; see also Allentuch Aff't, ¶ 4; Dunn Aff't, ¶ 8). Defendant has offered to pay $74,168, constituting sixty-two percent of the original settlement figure of $117,500, which offer was rejected by plaintiff. (Dkt. #74, at 6; Hakula Aff't, ¶ 6; Allentuch Aff't, ¶ 5 & Exhs. 2-3).

In its brief in opposition to defendant's cross-motion, plaintiff argues that defendant "seeks to insert a material term into the [Settlement] Agreement that was never agreed to or bargained for by the parties during their preparation and execution of their Settlement Agreement[,]" namely the substitution of "industry standards" instead of "ordinary course of business" and "commercially reasonable manner" in Paragraph 1. (Dkt. #86, at 1-6). Plaintiff further contends that defendant "has known for years how . . . the 'Excess Materials' have been stored and maintained," in that on September 24, 2007, defendant sent two employees – Kirti Shah, its Materials Manager, and Bill Delaney, its Quality Assurance Manager – to inspect the Excess Materials, and defendant "raised no issues, objections, concerns or questions regarding the manner in which the Excess Materials were stored or maintained" after this inspection, until after the September 9, 2010 inspection. (Id. at 2, 6-8; Preziosi Aff't, ¶¶ 3, 5-8 & Exh. A).

In its reply brief, defendant counters that plaintiff "effectively admits that it did not comply with" industry standards (Dkt. #90, at 1), that defendant is not adding a new term

to the Settlement Agreement but instead is seeking to enforce the agreement as written (id. at 2-3), that the single 2007 visit is a "red herring" because Delaney visited plaintiff simply to "estimate the number of excess inventory pieces" held by plaintiff and not to inspect the Excess Materials regarding proper maintenance, about which he had no experience (id. at 3-5 & Delaney Aff't, ¶¶ 4-5), and that defendant's performance under the Settlement Agreement should be excused due to plaintiff's breach thereof (Dkt. #90, at 5).

Both sides refer to Paragraph 8(e) of the Settlement Agreement, entitled "Entire Agreement," which provides in full:

> This [Settlement] Agreement contains the entire understanding and agreement among the parties and supersedes all prior agreements and understandings, express or implied, oral or written, among the parties. The express terms of this [Settlement] Agreement shall control and supersede any course of performance or usage of the trade inconsistent with any of the terms hereof.

Plaintiff relies on this language to discount defendant's argument that plaintiff failed to adhere to "extrinsic" industry standards (Dkt. #86, at 8-9), while defendant points to this provision to dismiss plaintiff's reliance upon defendant's September 2007 inspection of plaintiff's facilities to review the Excess Materials. (Dkt. #90, at 4-5).

Plaintiff takes the simplistic approach that under the first sentence of Paragraph 1, defendant has no right to challenge the condition of the Excess Materials: "[Plaintiff] shall return to [Defendant] the Excess Materials in 'as-is/where-is' condition to [Defendant], without any warranty being extended." (Dkt. #86, at 4). Plaintiff is correct that under most circumstances, that would be the end of the discussion. See, e.g., Global Marine Shipping, Ltd. v. Tidewater, Inc., No. Civ. A 02-2570, 2004 WL 1920954, at *4 (E.D. La. Aug. 24, 2004)("under an 'as-is, where-is' contract, the purchaser takes the object as he finds it without warranty as to the quality or condition.")(citations, internal quotations & alterations

omitted); <u>Rochester Iron & Metal Co. v. United States</u>, 339 F.2d 640, 643 (Ct. Cl. 1964)("The very nature of an 'as-is' and 'where-is' contract serves notice upon a prospective purchaser that the risk of loss is on the purchaser. In other words, 'Let the buyer beware.' Such has been the established law for almost forty years.").

Defendant, however, appropriately points to the next sentence, which qualifies the "as-is/where-is" restriction – "<u>Notwithstanding the foregoing</u>, [Plaintiff] represents that the Excess Materials have been maintained: (1) in the ordinary course of business; and (2) in a commercially reasonable manner for Excess Materials[,]" -- as well as the fifth sentence – "Defendant may reasonably inspect the Excess Materials <u>to determine whether [Plaintiff's] representations are materially accurate</u>." (emphasis added). (Dkt. #74, at 3, 9). These two sentences take this matter past the simple conclusion that defendant took the Excess Materials as it found them without any warranty as to quality or condition. <u>See Global Marine</u>, 2004 WL 1920954, at *4.

Despite the copious post-settlement filings here, the sole determinative issue raised by the parties is whether the terms "ordinary course of business" and "commercially reasonable manner" in Paragraph 1 really mean "industry standards," as argued by defendant. (<u>Compare</u> Dkt. #74, at 3-5, 7-8 <u>with</u> Dkt. #86, at 2, 3, 4-6). Defendant relies primarily on the Seventh Circuit's decision from last summer in <u>Metavante Corp. v. Emigrant Sav. Bank</u>, Nos. 09-3007, 09-3996, 2010 WL 3385961 (7th Cir. Aug. 30, 2010), regarding a "Technology Outsourcing Agreement" under which plaintiff provided all electronic banking services to the defendant-bank; defendant terminated the agreement due to several alleged flaws in the computer systems. At *1-4. At issue was plaintiff's warranty in this agreement that it would "provide all Services in a commercially reasonably manner." At *9 (citation omitted). Among the several reasons that the Seventh Circuit upheld the district court's oral

10

ruling, issued after a bench trial, at *10-12, was the district court's adoption of the definition from Black's Law Dictionary that the term "commercially reasonable manner" means "a transaction conducted in good faith and in accordance with commonly accepted commercial practice." At *10 (citation omitted). However, as plaintiff appropriately argues, the definition of "commercially reasonable manner" as "in accordance with commonly accepted commercial practice" does not necessarily translate "commercially reasonable manner" into "industry standards," two words that nowhere appear in the Settlement Agreement. (Dkt. #86, at 4-6).

Plaintiff, instead, relies upon Lemond Cycling, Inc. v. PTI Holding, Inc., No. Civ. 03-5441 (PAM/RLE), 2005 WL 102969 (D. Minn. Jan. 14, 2005), in which plaintiff LeMond Cycling Inc. (founded by the cycling superstar, Greg Lemond) entered into a written contract with defendant, a manufacturer and distributor of cycling accessories with long-standing license agreements with, inter alia, Mattel, Hasbro, Barbie, Playskool and Tonka, to distribute their products to mass market retailers such as Target, Wal-Mart, Toys R US, and others. Id. at *1. Under the agreement between the parties in that lawsuit, defendant was required to "use its commercially reasonable efforts to develop, produce, market and produce a good quality representative line for [plaintiff], consistent with the image, reputation and accomplishments of LeMond, . . . to compete with major competitors . . ." Id. (citation omitted). After the product line failed, particularly at Target, plaintiff commenced a breach of contract against defendant, alleging, inter alia, that defendant "failed to use commercially reasonable efforts to market and sell the Lemond Product Line." Id. at *2-3 (citation omitted).

Like here, the written contract did not define "commercially reasonable" – defendant argued that "'commercially reasonable' [did] not equate with 'best efforts,'" while plaintiff

11

argued that "'commercially reasonable' require[d] an examination of customary practices within the licensing industry." Id. at *5 (citation omitted). The district judge rejected plaintiff's position: "[Plaintiff's] broad argument that only industry standards are relevant to the commercial reasonableness determination is unpersuasive. Although an objective component is instructive as to whether or not [defendant] acted with commercial reasonableness, there must be a subjective evaluation as well." Id. Because the written agreement was "silent as to what is commercially reasonable[,]" and there was "simply not enough evidence before the Court to indicate what the parties intended at the time the [written contract] was executed[,]" the district judge found that there were material questions of facts that precluded summary judgment. Id.

Thus, the LeMond Cycling decision strongly supports plaintiff's argument here that the terms "ordinary course of business" and "commercially reasonable manner" in Paragraph 1 of the Settlement Agreement, which are undefined, do not implicitly mean "industry standards," particularly when, as defense counsel readily acknowledges, the language of Paragraph 1 "was extremely hard fought and the subject of many revisions and discussions with the Magistrate Judge." (Dkt. #74, at 9; Dkt. #86, at 3-4). Defendant's sole basis for alleging breach of the Settlement Agreement by plaintiff is plaintiff's failure to adhere to industry standards, namely those written and issued by JEDEC and IPC. (Dkt. #74, at 3-5, 7-8; Urtega Aff't, ¶¶ 2-12 & Exhs. 1-4 ). Nowhere in its extensive filings does defendant address any breach by plaintiff of the requirements of "ordinary course of business" and "commercially reasonable manner" outside of the JEDEC and IPC industry standards. (See, e.g., Urtega Aff't, ¶ 16)("In sum, the Defective Materials have not been maintained according to applicable standards. [Plaintiff's] lack of diligence in maintaining these items was not commercially reasonable."). However, unfortunately, as in LeMond Cycling, despite the over

abundance of filings in a case which should have died a natural death last summer or early autumn, defendant is correct that there is no evidence in the file as to the standards of "ordinary course of business" and "commercially reasonable manner" outside of the JEDEC and IPC industry standards. (Dkt. #90, at 1-3). The only evidence presented by plaintiff is the affidavit of its former President and outside counsel, Michael W. Dunn, in which he averred that the Excess Materials "have been stored and maintained by [Plaintiff] in the ordinary course of business and in a commercially reasonable manner at all times, as represented in Paragraph 1 of the Agreement." (Dunn Aff't, ¶ 8). While this Magistrate Judge is the last person who wants to prolong this matter any further, it does appear necessary to have an evidentiary hearing to address what constitutes "ordinary course of business" and "commercially reasonable manner" outside of the JEDEC and IPC industry standards, in order for the Court to determine whether plaintiff breached, in part, the warranties made in Paragraph 1 of the Settlement Agreement.[7]

In addition to this open issue, the Court and parties need to address the issue of potential damages, if the Court determines that a breach has occurred. According to defendant, the defective Excess Materials are "not only unusable, but [they] cannot be discarded in regular municipal trash . . . [but rather] must be handled by a special disposal service[,]" as a result of which, the defective Excess Materials have "no use and ha[ve] no value or [have] a negative value." (Urtega Aff't, ¶¶ 13, 16).

---

[7]A collateral issue is the effect, if any, of the September 24, 2007 visit by two representatives of defendant at plaintiff's facility to inspect the Excess Materials. (Dkts. ##-63, at 3-4; Dunn Aff't, ¶¶ 8-10; Dkt. #74, at 9-10; Hakula Aff't, ¶¶ 2-3; Dkt. #86, at 6-8; Preziosi Aff't, ¶¶ 5-8; Dkt. #90, at 3-5; Delaney Aff't, ¶¶ 1, 3-5). Delaney has sworn under oath that during this visit he merely "counted or estimated the quantities of certain parts[,]" but "did not examine whether the excess materials were properly maintained . . . [because] at that time, I had no experience in that area. . . ." (Delaney Aff't, ¶ 4). In light of Delaney's representations, the 2007 visit is irrelevant to any further discussion of Paragraph 1.

As stated above, in assessing how much of the Excess Materials are not in compliance with plaintiff's representations, defendant has offered to pay $74,168, constituting sixty-two percent of the original settlement figure of $117,500, for the Excess Materials not governed by industry standards, as well as Class 1 and 6 electronic components (but not Class 2 through Class 5a electronic components); this offer was rejected by plaintiff. (Dkt. #74, at 6; Hakula Aff't, ¶ 6; Allentuch Aff't, ¶ 5 & Exhs. 2-3). Such an offer presumes, however, that the entire settlement figure of $117,500 was based upon defendant's ability to use the Excess Materials; the negotiation process reflects, in sharp contrast, that the Excess Materials issue was instead the "tail that wagged the dog." Therefore, at the evidentiary hearing, counsel must address the portion of the $117,500 settlement figure that was attributable to defendant's ability to use the Excess Materials.

### III. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion to Reopen Case and/or Enforce Settlement Agreement (Dkt. #53) is <u>granted in part to the extent plaintiff seeks to reopen the case to consider these motions</u>, and the two remaining motions – plaintiff's Supplemental Motion to Enforce Settlement and Release Agreement (Dkt. #63), and defendant's Motion to Enforce Settlement Agreement (Dkt. #73) – are held in abeyance, pending an evidentiary hearing. Counsel **promptly** should contact this Magistrate Judge's Chambers, in order to schedule such evidentiary hearing in late January or February 2011.[8]

<u>See</u> 28 U.S.C. § 636(b)(**written objections to ruling must be filed within fourteen days after service of same**); Fed. R. Civ. P. 6(a) & 72; Rule 72.2 of the Local

---

[8]It goes without saying that before the parties and counsel invest more time, money, and energy into this file, where the amount of money at stake is not sufficiently high to justify the attention and expense it has received, they ought to confer with one another, <u>as mature, professional, and **financially savvy** adults</u>, in order to **finally** resolve this controversy.

14

Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Sec'y, H & HS, 892 F.2d 15, 16 (2d Cir. 1989)(**failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit.**).

Dated at New Haven, Connecticut, this 11th day of January, 2011.

                                      /s/ Joan G. Margolis, USMJ
                                      Joan Glazer Margolis
                                      United States Magistrate Judge